This is the third discrimination case this morning and is the second from the sunny state of Arizona. This is similar to the others and yet, importantly, different. The primary issues in this case, your honors, are pretext and constructive discharge. What evidence is there of constructive discharge? It seems that after the decision that your client didn't particularly appreciate, which I can understand, they still offered him the same job, they didn't take away any of his special compensation, they encouraged him to stay, but he made the decision himself to leave. How does that amount to constructive discharge? If one looks at the totality of the circumstances, your honor, as the Satterwhite case requires, one has to look at everything, including the pay reduction down to about 50% of where it was. Being relegated from one who was in charge of a very important department, one of six in the company, to a laborer, the position in which Mr. Brownell began 22 years earlier. He would have to report to the very person he trained, Mr. Maxson. He would have to train that person, supposedly, the better candidate who was more qualified. His benefits were reduced. His career with the company that he'd worked hard for as a dedicated, loyal employee for 22 years was over. At his age, the idea of finding employment in a town of 1,000, Clarkdale, Arizona, was virtually impossible. The impact, your honor, is some sort of... I'm sorry, what did you just say? The idea of trying to find similar employment in a tiny town of 1,000, Clarkdale, Arizona, was virtually impossible. Why does that add anything to constructive discharge? That suggests he ought to stay if he can't find any other job. Finish Cement is the only cement plant, your honor, producing raw cement in the state of Arizona. The law does not require Mr. Brownell to travel to a different state, try to find some other shipping department for which he was eminently qualified to apply for a job. His entire career with Phoenix Cement that he invested all this time in was over, and it's too late to go out looking again. Moreover, your honor, by not getting the job that he should that he held in an official way, prevented him from moving into the higher echelon where no longer is salary and benefits governed by a formula that is limited as it applies lower down in the food chain. Rather, the position also holds a greater upward mobility in terms of salary and benefits, so he was denied that also, your honor. So, viewing the totality of all of these matters, the blow is devastating. His career, his working life for the past 22 years was effectively over. There wasn't one little thing. Well, the constricting discharge, the firing argument is that conditions were such that work was basically became intolerable. The conditions of his employment changed, and therefore he had no choice but to leave. Yes, your honor. Judge Trott's question is what evidence is there that supports that claim? Well, first of all, your honor. And you pointed to several. You pointed to he had to train the fellow who got the job. He lost some pay. What else? His pay was cut in about half, your honor, altogether, and his career was over. He was demoted back to a laborer. He had a career at that particular company. Yes, and for all practical purposes, at age 56, starting to, you know, run out to look for new employment in the locale or even in the state in which he lived was not possible. So it's the totality again. I just am not tracking on why that's a reason why he was constructively discharged if he had no place to go. The conditions were intolerable at work, your honor. He was forced back to where he was 22 years earlier, half the pay. His expenses, his ability to live at that wage was unrealistic. You can't take a hit of 50% and expect to live in an adequate fashion without a major upheaval having taken place, which is what this was. Those conditions, your honor, are certainly questions for a prior effect. We should have gone to that prior effect. It is not a matter to be disposed of in summary judgment. As is true, we believe, of your other aspects. Well, your client also said he believed Moore honestly didn't want him to retire. I'm sorry, your honor? Your client seemed to have testified that he believed that Moore did not want him to retire. And that's because Moore wanted him to train the person who was supposedly better than him, who he trained earlier when he came into the company, Tom Matson. Moore was in a jam. He had to have this person trained to produce. And so, yes, he probably was genuinely interested in Mr. Brownell accomplishing that for him to get him out of that jam. Turning to your promotion claim, failure to promote, where did the district court go wrong? They didn't consider all of the evidence, your honor. They weighed evidence. They did not relegate the matter to the trier of fact. They used the wrong standard in evaluating the matter and did not even take into account a great deal of plaintiff's evidence that the reasons given were pretextual. Plaintiff effectively rebutted, more than rebutted, the eight points raised in Mr. Gorby's affidavit that were given to try to suggest nondiscriminatory motives. They were totally rebutted. And yet the district court seemed to have ignored that. Moreover, these were all issues that were raised way, way after the time of the failure to promote. And as this court has said on many occasions, one has to look with a great deal of suspicion and askance when reasons are given after the fact of the event itself. In this case, they came up for the first time as part of the motion for summary judgment package, years after the supposed employment interview and decision. At the time of the decision, your honor, no reasons were given whatsoever. Not only do we have the shifting explanation circumstance, we have the situation of no explanation followed by, years later, supposed reasons being given which were ones which, had they really existed truthfully, could have been given in a straightforward manner at the time of the actual decision itself. And they were not. Therefore, your honor, a great deal of what the defendant's position was has to be viewed with a great deal of suspicion. The defendant completely overturned the supposed proffered reasons by the arguments, by the facts that are presented in the opposition to the motion for summary judgment, together, your honor, with such incredibly strong evidence that the employment selection, I'm sorry, the job selection process, this committee, was a farce. The things that are wrong with it are red flags, are sirens going off in all directions, and yet the district court ignored that and treated them as if everything was appropriate. We believe that's incorrect and erroneous. Let me go back here for a second. You told us that they were going to cut his pay in half. Yes, sir. I'm just having trouble following that. Sure. Lee responded first. He said he realized that I was more qualified than that. Jim Moore said that he told them they weren't going to take my lead man pay away. I went back to Lee and he said he wanted me to stay on as the lead man and teach Maxim what he needed to know about the department. So Jim told you that even though you had not been selected, that you would not give up, they would not take away your lead man additional pay? Yes. And that additional pay was about $1.50 an hour. Would you lose your acting foreman $0.50 an hour? Yes. I heard you say his pay was going to be cut in half. How does that compute? Sure. Your Honor, the word acting foreman is probably incorrect. He was acting supervisor because Cliff Ayers was spread too thin. He was also a lead man, so he was doing both of these things, and for both of these jobs he received extra pay. I think for the acting supervisor it was another $0.50 an hour. For the lead man it was another $1.50 an hour. Then there was overtime. Then there were benefits, Your Honor, pension benefits, including retirement, including medical, and so on and so forth. If you add the entire package together, that's where it goes from down to half from what it was. You also have to factor in, Your Honor, Did he lose retirement? I'm sorry? Did he lose retirement and pension benefits and health benefits because of the loss of the $2? No, sir. But the benefits are reduced because they are dependent. The retirement benefits and pension plan and profit sharing are dependent upon the basic salary itself. So by cutting it back, you're reducing the amount that goes into the pension bucket, if we can call it that, for these purposes. It seems to me you've overstated massively the economic impact on your client. These are his calculations, Your Honor. He figured it out. He's a very accurate, fastidious individual. Who produced this Ayers affidavit? Yes, sir. Who produced this Ayers affidavit that Mr. Ayers says is not his affidavit? Mr. Ayers said that, and yet he requires qualification. The plaintiff, to answer your question, Your Honor, the plaintiff produced the affidavit. Your client produced it? No, sir. Who? I interviewed Mr. Ayers myself. He told me what the points were. I drafted what he had said. He reviewed the draft, and he said, yes, this is accurate. He then signed it. His deposition was taken for almost a full day to try to deal with the affidavit by the defendant. In his deposition, he affirmed the greatest majority of the points in the affidavit, Your Honor. Greatest majority? Yes, sir. Then why does he disclaim the affidavit entirely as his? Because that wasn't what he did, Your Honor. He said he did not personally or physically write it, and that's true. But he did provide the information that went into it. He says there's a lot of stuff in it that he couldn't testify to. The only part, Your Honor, and we did not include that in our presentation to the Court. I think there was a disagreement, if I can recall, about an adjective that had to do with how much more disqualified Mr. Maxson was than Mr. Brownell. I believe he, in the affidavit, and these were his words, but in part of the problem, Your Honor, is in his deposition, he did not have the affidavit notes that he had made of corrections before him. So he was going on memory. But the actual final rendition of the affidavit were taken precisely from the corrected version in his writing that he did do. But unfortunately, in his deposition, he did not have that at hand, and therefore did not recall some of the things that were said. There were only a handful of things. And we did not utilize, Your Honor, the things that he did not believe in the deposition were part of his memory. So we ignored those. We did not use those. Interestingly enough, Your Honor, the defendant, while decrying Mr. Ayers' deposition, uses a great deal of it for themselves, for their own position. This is the two sides of the mouth approach. But Mr. Ayers was deposed extensively for almost the full day. And he affirmed, as I said, Your Honor, almost each and every part of his affidavit. The only parts he did not. Almost. I mean, you keep using these qualifiers that just get you involved in a quicksand here. And that's because, Your Honor, he did not recall parts of it because he did not have the corrections he made in front of him at the time. Do you want to save your first few times for rebuttal? Yes, I do. Thank you. Okay. May it please the Court. My name is Jim Mackey, and I'm here on behalf of the Salt River-Piedmont-Maricopa Indian Community doing business as Phoenix Cement Division. I'll refer to them as Phoenix Cement. If I may, I'd like to start by directing my comments to the constructive discharge claim and to Judge Trott's comments and observation that the constructive discharge claim is, I think, founded almost entirely, as indicated by Mr. Earle's comments, on this massive overstatement that Mr. Earle and Mr. Brownell have made in their pleadings and throughout this case. The reality is that the only impact of this decision was a 50 percent decrease in Mr. Brownell's pay. 50 percent decrease? Excuse me, 50 cent. I apologize. Fifty cent. And that's exactly the thing, is that Mr. Brownell would have this Court believe that it was 50 percent and that he was reduced all the way down to a laborer, down to the position that he held when he began with the company. In fact, as Mr. Moore expressly told him, that was not the case. And all he said was, I assumed I would be, as the district court said, that's not enough to get you anywhere on constructive discharge. Exactly, Your Honor. This was a self-fulfilling prophecy. He decided that all of this was going to happen. All of these bad things were going to happen, so he made them happen. And the reality was, is that he was expressly told that that was not going to happen. And, in fact, his — what he would want this Court to say is, is that it was reasonable for him to believe that, and so, therefore, he could make it happen. But even if that were the case, there's no evidence in this record to support that belief. In fact, from the beginning of the plant modernization, the company made it expressed to the employees on a regular basis that no one would ever lose their job or position because of the plant modernization. And there's no evidence in this record that anyone ever did it. And so what the plaintiff would have — the appellant, Mr. Brownell, would have this Court believe is that it was reasonable for him to believe that he was going to lose his position when no one, in fact, had ever lost their position. And so his — his reduction, because of this position that he held as an acting foreman, and he promotes himself first, then he demotes himself. He was actually — his testimony was that he was an acting foreman. Cliff Ayers was the shipping supervisor. He — he appointed Mr. Brownell to be the acting foreman. Mr. Brownell had limited authority. He had no hiring authority, no firing authority. He did not attend management meetings. He was an acting foreman. In that capacity, for example, he did not supervise Robin Gleckel, who becomes significant, because one of the — one of the purposes or one of the points that was significant in the decision not to promote Mr. Brownell was his inability to get along with and supervise Robin Gleckel. So with regard to the constructive discharge claim, though, is that — is that Mr. Brownell was an acting foreman. He got 50 cents an hour for that. He lost that 50 cents an hour. He knew that that was revocable at any time. In fact, at any time, either the company or Mr. Ayers could have decided that Mr. Ayers needed to fulfill those responsibilities himself, and he could have taken over those responsibilities, and Mr. Brownell would have lost that 50 cents an hour. To suggest that his working conditions would somehow have become intolerable simply because he no longer earned that extra 50 cents for earning — for performing those extra functions is absurd, Your Honor. Your Honor, with regard — with regard to the construct — I mean, with the wrongful termination claim — Wrongful termination? Excuse me. Wrongful promotion? Failure to promote. Failure to promote. I apologize, Your Honor. With regard to the failure to promote claim, the facts in this case are very simple. There is no direct evidence of discrimination here, and the plain appellant has failed to come forth with any evidence at all of age discrimination. The only inference at all that could be drawn for age discrimination is by the mere fact that he was older than Mr. Maxson, who was selected. About 15 years? Yes, Your Honor. So you got your prima facie case. The other side comes forward and says the reason why we promoted the other gentleman is because he was better at getting along with people. Well, that was part of it. Yeah. As a general matter, he was a better people person, and primarily, he was going to be better able to get along with the two primary people that he was going to have to work with. And then there's a whole list of performance allegations, and the other side says those were all phony. He disputes every one of those and says that's not the case at all. What do we do with that? Well, the reality is, is Mr. Brownell has attempted to raise a dispute as to whether or not these performance issues actually occurred in the sense that he says, well, I disagree that I was supposed to be sampling and whether or not Mr. Gorby had talked to me about that, but the bottom line is, is that it is undisputed, and Mr. Ayers testified this unequivocally, is that Mr. Gorby had on repeated occasions complained to Cliff Ayers when Ayers was Mr. Brownell's supervisor. Before he left the company, Mr. Gorby had complained to Ayers about Mr. Brownell's performance. Mr. Ayers also testified that he knew that Gorby and Brownell did not get along, that Gorby did not like Brownell, and that he believed it to be because of a misunderstanding about the department or about Brownell's duties, but he did not believe it had anything to do with age. And, in fact, that occurred before this selection process. So what you have here is you have a situation in which this Mr. Brownell supporter, Mr. Ayers, leaves the company on administrative leave for alleged improprieties, leaving now Mr. Gorby in charge of that department. So the new shipping supervisor is going to have to report to Mr. Gorby. Well, Mr. Gorby doesn't like Mr. Brownell from the get-go. So Mr. Brownell's supporter's gone. He's now looking at trying to get promoted by someone that doesn't like him. So Brownell goes to the interviews with three gentlemen who are in his same age range. He doesn't do very well in the interviews. The interviewers unanimously believe that Maxson interviewed better. They're aware of a number of factors in which Brownell has had problems with other people, including the fact that there's a pending race discrimination claim against him. They then unanimously determine, based on the factors, the interviews, the knowledge of the performance of the two candidates, and particularly from the testimony of Mr. Moore and Gorby, their ability to get along with Gorby and Robin Gleckel, they determine that Maxson is the better candidate for that position. Now, that position is not the same position that Brownell was doing before. It is a more elevated position, and the committee was certainly in a position to make a determination that Maxson, rather than Brownell, was a better candidate to be the shipping supervisor and to work with Gorby and Gleckel. Isn't there an issue of fact as to the validity of the reasons that Gorby put forth for the reasons that Maxson was promoted instead of Brownell? In other words, don't Brownell and Ayers refute specifically those reasons? I don't think so, Your Honor, because the fact is that while Mr. Brownell takes issue as to the specifics of those issues, whether or not the recycling should have been done or whether or not the sampling should have been done in a certain manner, it is undisputed that Mr. Gorby had those issues with Mr. Brownell and raised those complaints with Mr. Ayers before the selection process began because he raised them while Mr. Ayers was still the shipping supervisor. And the fact is, is while Mr. Brownell may take issue with anything that Gorby did, it is absolutely undisputed that Gorby did not like him before this process began, and it had nothing to do with age. And there's no evidence that, in this record at all, that anyone, Mr. Gorby or anyone else on the committee ever made any age comments. And even Mr. Ayers testified that he believed that the reasons that Gorby did not like Brownell had to do with nothing to do with age but with his own misunderstanding of the Department or with his belief that Brownell just simply wasn't performing correctly. But if Gorby comes through with eight or ten reasons and every one of those produces a disputed fact, then do you get an inference that the reasons were pretextual? Well, not in this instance, Your Honor, because what Mr. Gorby has stated is these were the reasons that I believed that he wasn't performing. Mr. Brownell comes back and says, well, yes, I was performing all those things, but the fact is, is that it doesn't matter whether or not he was performing them. What matters, and Mr. Ayers confirms this, is that Gorby did not believe that Brownell was performing them up to his standards, and Brownell admitted that there were times when Gorby asked for things and he was just wrong and he got overruled or it was decided differently after the fact because he may have wanted something and it was decided that maybe it wasn't the best decision. Well, Gorby perhaps may have been wrong about what he wanted and maybe he wanted something that wasn't so smart for the company, but the fact of the matter is he wanted it and Brownell didn't do it, and so that left a bad taste in his mouth with regard to Brownell. Whether or not Brownell ultimately determined he was doing it right or doing it wrong, it left a bad taste in Gorby's mouth, and that's undisputed. What do we do with this Ayers affidavit? Well, Your Honor, I think we've made it pretty clear in our papers that we believe that the Ayers affidavit is a sham altogether. The reality is, is that this affidavit was prepared entirely by Mr. Earle. It was the way this one happened. And as Your Honors are aware, Mr. Ayers has expressly rejected this affidavit and, in fact, in his signature for the affidavit, he expressly stated, this is not my affidavit. Throughout his deposition, he went through the statements that were attributed to him in the affidavit and said, those are not my words. I didn't say that. And notwithstanding that, a number of those statements, particularly the far inferior language, continues to find its way into Mr. Brownell's papers, including his opening brief. While Mr. Ayers testified that he would have selected Mr. Brownell over Mr. Maxson because he believed him to be more qualified for this position, the brief says, oh, he was clearly the most qualified, far inferior, hands down the most qualified. None of that appears in the record at all. And the far inferior language was expressly rejected by Mr. Ayers. And, in fact, I think that leads to, well, number one, I would urge the Court to, at a very minimum, closely scrutinize anything that Mr. Ayers has said for his actual testimony in his deposition, because that was on cross-examination and was not something that was prepared by Mr. Ayers and shoved, you know, into the record despite Mr. Ayers' statements to the contrary. But beyond that, I think one of the main issues in this case is that, in order to send this case to a jury, it is incumbent upon the appellate to establish that there is a genuine issue of material fact. And I think the key term is genuine, because I think that this record and these briefs, the opening brief and the reply, are replete with embellishments of the record. And the Ayers affidavit is a good example, but throughout it, there are a number of statements that are simply overstatements. And another good example is the 50 percent loss in salary that never actually occurred, the promotion of himself to a shipping supervisor, acting shipping supervisor instead of an acting foreman. You know, at one point, at one point, he states that Mr. Moore said it would be dishonest to use the interview evaluation forms. There's nothing in the record to support such a statement. The reality is, is that in order for this court to find a genuine issue of material fact, I think it needs to weed through all of the embellishment and argument and find out what the real facts are. And when it does that, it will find that there are no facts in this case to support either the AIDS discrimination claim or the constructive discharge claim. Thank you. Thank you, Your Honor. You have a few minutes of rebuttal. Thank you. Your Honor, I, concerning the constructive discharge matter once again, Mr. Brownell knew, because of his experience with the company and because of his experience with the thinking along company lines, that it was a foregone conclusion that he would lose the lead man position. It made no sense whatsoever for there to be a full-time true supervisor and a full-time lead man. The whole idea in having the lead man, I'm sorry, the supervisor position held by one person was to consolidate and therefore to eliminate the lead man position. And that's exactly what did happen. The lead man position was eliminated because it made no sense. And that was after Mr. Brownell left. Yes, sir. But he knew ahead of time that that would have to be the case because nothing else made sense. So he was able to predict it. Does that really drive him out? In other words, he's sure something's going to happen, so he leaves. And sure enough, it does, based on the fact he left. Does that prove? Again, it's the totality of the circumstances, Your Honor. It was all of these things that came together. That was one of the components. He knew that with it taking place, as it was sure to do and which it did occur, that it with everything else would create an intolerable working situation. And again, Your Honor, we believe that's something for the trier of fact. That's not to be weighed at this stage. That's something that the trier of fact. Well, that's easy to say, trier of fact. But what you're talking about is that you can never have a summary judgment if somebody gets up and says, whoops, there's an issue of fact. That's not the test. No, sir. It has to be credible opposition. It has to be meritorious opposition. And we believe that that's what does exist, not just any voice in the wilderness at all. Constructive discharge is exactly what it says, constructive discharge. And it simply, under the law, isn't enough to opine, well, they're going to do bad things to me. Even though they've told me they aren't, so I'm leaving. That's not constructive discharge. That's choice. Let me ask you a question about this affidavit. The affidavit under grinding and sacking at page 8 says, Grinding and sacking, the statements made by Lee Gorby in paragraph 3G is untrue. There were no problems. If there had been, I would have known about it. This goes to whether Gorby and your client had issues before the decision was made. In the deposition, Ayers backs away from that. Well, other than it states, quote, there were no problems, you know. I did know of problems between the two, but there were no serious problems. And did it not involve grinding and sacking allegations Gorby makes in 3G of his affidavit? Correct. While I was there, correct. So the affidavit falsely claims that there were no problems with grinding and sacking, the affidavit that he disclaims. But in the deposition, now you're, Mr. Ayers says, yeah, I did know of problems on grinding and sacking. So isn't it correct that prior to the decision, there was a dispute between Gorby and your client over grinding and sacking at the very least? First of all, Your Honor, I believe that the difficulty with Mr. Ayers in the deposition is he did not have the corrected draft of the affidavit in front of him to look at. Secondly, Your Honor, if in fact that was a problem, why was it never mentioned to Mr. Brownell before the selection process? Why wasn't it in the personnel records that they didn't even call for? Why wasn't it in the performance evaluation? That's an empty rhetorical question. I'm sorry. The question becomes whether there was a dispute between Gorby and your client prior to the thing, and Mr. Ayers even says there was. If there was and it was of any magnitude, Your Honor, then, again, why wasn't it something that was in a personnel file or in an evaluation? If there was, it was so minor that it did not come to a rise to any level so as to constitute a problem. And that's part of the problem with this entire matter on pretext. They did not achieve, they did not obtain the records. There's a spoilation of evidence issue. They did not call for production records. They did not conduct the interview as a nondiscriminatory, reasonable management or selection committee would have done in so many ways, and they're spelled out. Your Honor, one very quick point about this racial thing. What the opposition doesn't mention is that there was another case. In that case, it was Phoenix Cement who was accused of racial discrimination and age discrimination. Those cases were before this Court. And I'll provide the case numbers afterwards. But in the case to which reference was made, the McCoy case, Phoenix Cement paid a substantial sum of money in settlement by a negotiator that came out from this very Court to Phoenix to deal with it and the other case. The charges against Mr. Brownell were never proved. They certainly were enough with Phoenix Cement. Without admitting liability, did they pay a settlement? They did pay a settlement, Your Honor. And the terms of it they admitted or not admit liability? No, they did not admit liability, as I noted. You're wasting our time with this. All right. I apologize. Your Honor, the – I would suggest again that with respect to Mr. Ayers, just to put a final wrap on it, that actually reading the pertinent parts of this deposition are the best answer about any possible disparities between the deposition and the affidavit.  We did not, and for the reasons I mentioned, we did not use the portions of it where there was a question or an ambiguity or something that lacked the validity that we believe is important in presenting this to the Court. And again, there was nothing said by Mr. Ayers or by Mr. Gorby beforehand, Your Honor. All of these things are made up after the fact. And they have to be, and Your Honor is quite correct, these are factual matters that have to go beyond the motion for summary judgment. The incidentally, Your Honor, these issues about the eight points that Gorby have raised, they were never subsequently challenged in further pleadings by the defendants, who essentially conceded that our challenges to those proffered reasons were in place and were appropriate. We believe that, Your Honor, this together with the not the best person for the job rule coming out of cases from this district, which indicates that if the person that was not the best person for the job was chosen, there has to be close scrutiny as to what the reasons are, and it is probative on the issue of whether or not the reasons were impermissible reasons. I see that time is up. Thank you very much. Thank you very much. We appreciate your argument. The case is submitted.
judges: Trott, T.G. Nelson, Paez